NOT DESIGNATED FOR PUBLICATION

No. 119,126

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARSHALL JOSEPH MATTHEWS III,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed December 20, 2019.
Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Anna M. Jumpponen*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GARDNER, J., and MCANANY, S.J.

PER CURIAM: A.K. and Marshall Joseph Matthews III were never formally married, but they considered themselves to be husband and wife under common law. In early November 2016, Matthews was on probation following a federal drug crime conviction. One of his probation requirements was that he submit to periodic urinalyses. His last urine sample tested positive for methamphetamine. As a result, his probation officer informed him that he would have to report to a halfway house where he would have to spend a couple of months.

1

A few days later, as Matthews prepared to report to the halfway house, he confronted A.K. in their bedroom and questioned her about whether she would take care of his personal effects and whether she would remain faithful to him while he was away. An argument ensued, which turned into a physical altercation. Matthews pulled A.K.'s hair and pushed her face into the bed. When A.K. said she was going to leave, Matthews told her she was not going anywhere. When A.K. tried to leave, Matthews threw her back on the bed. When A.K. tried to fight back, Matthews struck her on the head. He rolled A.K. over on the bed and said, "[I]f you're going to be a whore and give what's mine away I'm just going to take it." A.K. later testified that at that point Matthews raped her.

Matthews eventually allowed A.K. to leave for work. After telling her boss what happened, she went to the hospital for an examination and then went to the police station. At the hospital she reported severe pain in her head where Matthews had struck her. An examination disclosed an abrasion on the right side of her face and forehead and swelling in the area where A.K. said Matthews had struck her.

Matthews was charged with rape, aggravated kidnapping, domestic battery, and four counts of witness intimidation. Matthews' trial ended in a mistrial, and Matthews was retried.

In advance of Matthews' retrial, the State moved under K.S.A. 2018 Supp. 60-455 to admit at trial evidence that Matthews was on federal probation and had tested positive for methamphetamine in the days leading up to the incident in question. Matthews opposed the State's motion, arguing that the fact that he had tested positive for methamphetamine was irrelevant to the crimes charged. The court granted the State's motion, finding that the evidence was admissible because it related to Matthews' state of mind and the "deteriorating marital relationship and the marital discord" which played a role in the events leading to the charges against Matthews. During Matthews' retrial, the State introduced this evidence over Matthews' objection.

At the court's instruction conference, the court gave counsel a final version of the instruction at issue in this case—Instruction No. 11, which states:

"The defendant is charged in Count Two with aggravated kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.     The defendant took or confined [A.K.] by force.

"2.     The defendant did so with the intent to hold [A.K.] to inflict bodily injury on or to terrorize [A.K.]

"3.     Bodily harm was inflicted upon [A.K.]

"4.     This act occurred on or about the 7th day of November, 2016 in Saline County, Kansas.

"'Taking or confinement' requires no particular distance or removal, nor any particular time or place of confinement.

"Only unnecessary acts of violence upon the victim, and those occurring after the initial abduction, which result in injuries to the victim constitute bodily harm. Trivial injuries and insignificant bruises or impressions resulting from the abduction itself do not constitute bodily harm. Rape is an act of violence and as a matter of law can constitute bodily harm."

The State had originally proposed that the instruction state that rape constitutes bodily harm as a matter of law. The State pointed out that Karen Groot, the forensic nurse at the hospital A.K. visited after this incident, testified that when she examined A.K. she noted that there was a redness of the fossa navicularis, which is part of the female sexual anatomy. Groot testified that this redness typically occurs when there is "force or something that, you know, doesn't have adequate lubrication." According to Groot, this finding "is not an uncommon finding with people that tell us [they have been raped]." But on cross-examination, Groot stated that in her genital examination of A.K. she did not note any injury or trauma to any parts of the genital area. Groot stated that the redness she

3

observed is not considered an injury, just a finding. Groot conceded that this finding of redness could be from consensual intercourse "[o]r any number of other things."

In anticipation of Matthews arguing in closing that the parties' sexual intercourse was consensual rather than rape, as evidenced by the fact that A.K. suffered no genital trauma or injury, the State proposed that the final sentence of this aggravated kidnapping instruction should state:  Rape is an act of violence and as a matter of law constitutes bodily harm. Thus, the State need not present any evidence of genital injury, such as abrasions or tearing, to prove rape.

In the final form of Instruction No. 11, the court changed the last sentence of the instruction so that the jury was instructed that rape *can* constitute bodily harm. Matthews' counsel objected to the instruction and argued that the last sentence should be eliminated in its entirety. He stated:

> "I think [this instruction] directs the jury to convict of aggravated kidnapping if they convict on rape. And I think it helps that the Court included the word 'can,' can constitute bodily harm, but still concerned that it's directing them if you found rape you should also convict him of the aggravated kidnapping."

The court overruled Matthews' objection, explaining:

> "The evidence is that there was not injury, which does not mean that rape did not occur. That redness which could be interpreted as consensual sexual intercourse . . . lends itself to saying there was no bodily harm, and the case law is clear that rape in and of itself is an act of violence, and is bodily harm. The Court included the word 'can' because I wanted

4

the jury to . . . be instructed that as a matter of law rape can be considered an act of, or can be considered bodily harm, is an act of violence. I don't see that as directing the verdict."

But when the judge read the instruction to the jury, according to the trial transcript he inadvertently omitted the word "can" and instructed the jury that "[r]ape is an act of violence and as a matter of law constitute bodily harm." This is what the State had originally proposed and what the trial judge changed in the court's final written instructions. The jurors apparently had not been provided individual copies of the jury instructions so they could read along with the judge and catch the apparent error. In any event, neither party objected to the judge's incorrect oral reading of the instruction to the jury.

In her closing argument, the prosecutor used the court's original written instruction in referring to the definition of bodily harm in the aggravated kidnapping instruction: "[R]ape is an act of violence as a matter of law that *can* constitute bodily harm." (Emphasis added.) Following the closing arguments, the court directed the jury to report to the jury room where the court would send the original and 11 copies of the written jury instructions, the verdict forms, and all the exhibits admitted into evidence.

After deliberating, the jury found Matthews guilty of aggravated kidnapping, domestic battery, and intimidation of a witness. But the jury was unable to reach a verdict on the charge of rape.

Matthews' appeal brings the matter before us. He raises two claims of error on appeal: (1) the district court erroneously instructed the jury that rape constitutes bodily harm, and (2) the district court erroneously admitted evidence that Matthews used methamphetamine before the incident giving rise to these charges.

*The Oral Recital of Instruction No. 11 Was Erroneous But Does Not Require Reversal.*

Following *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018), we analyze Matthews' first claim regarding the reading of the court's jury instructions (1) by determining whether the issue was preserved for our review; if so, (2) by considering the merits of the claim to determine if the claimed error occurred; and if the claimed error occurred, (3) by then determining whether the error requires reversal.

*Step One: Preservation*

In the first step we consider whether Matthews preserved the issue for appeal by objecting to the instruction. He did at the instruction conference but not when the court apparently misread to the jury the written instruction.

The version of the instruction that the judge read to the jury was the version to which Matthews originally objected at the instruction conference just minutes before the instructions were read to the jury. At the instruction conference Matthews' objection was that the last sentence of the instruction essentially directed a verdict against him on the charge of aggravated kidnapping. On appeal, he raises essentially the same issue, though cloaked in constitutional garb, when he argues that that the instruction as read to the jury deprived him of his Fifth and Sixth Amendment rights to have the jury determine his guilt or innocence. Under these circumstances, Matthews preserved his objection for our review.

*Step Two: The Merits of the Claim*

In the second step, we consider whether the instruction was legally and factually appropriate. *McLinn*, 307 Kan. at 318. We exercise unlimited review in determining whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376

6

P.3d 70 (2016). With regard to the factual appropriateness of the instruction, in *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016), we are told that we must determine whether there was sufficient evidence, "'viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" Based on our reading of the progenitor of *Williams*, we take this to mean in the light most favoring the proponent of the instruction. See *State v. Plummer*, 295 Kan. 156, 160, 283 P.3d 202 (2012). We will address the merits later in this opinion.

*Step Three: Whether an Error Requires Reversal*

In the third step, we consider the issue of prejudice. When a criminal defendant objected to a jury instruction and the instruction was either legally or factually inappropriate, our task is to consider the issue of prejudice and usually determine whether in light of the entire record of the case there is a reasonable probability that erroneously giving the instruction had a negative effect, from the defendant's perspective, on the outcome of the trial. See *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016).

But here, Matthews couches his objection to Instruction No. 11 as a denial of his constitutional rights under the Fifth and Sixth Amendments to the United States Constitution to have the jury determine his innocence or guilt, rather than to have the trial court essentially direct a verdict against him on the aggravated kidnapping charge. In this situation our test under this third step is set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012): the error is harmless if we are persuaded "beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict." See also *State v. Ingham*, 308 Kan. 1466, 1473-74, 430 P.3d 931 (2018).

*Analysis*

We have already resolved the preservation issue. We now turn to whether the instruction was legally appropriate. Matthews does not contend that the district court's written instruction on aggravated kidnapping was legally inappropriate. That instruction stated that in considering a charge of aggravated kidnapping, which requires proof that the victim suffered bodily harm, "[r]ape is an act of violence and as a matter of law *can* constitute" the bodily harm that turns basic kidnapping into aggravated kidnapping. (Emphasis added.)

Matthews takes the position that in considering this issue we must look not to the written instruction but rather to the court's oral instruction to the jury which apparently eliminated the word "can" from the last sentence of Instruction No. 11. He relies on *State v. Castoreno*, 255 Kan. 401, 874 P.2d 1173 (1994), for the proposition that a correct written jury instruction does not cure a faulty oral instruction to the jury.

Matthews cites *State v. Brice*, 276 Kan. 758, 772, 80 P.3d 1113 (2003), for the proposition that an instruction that "invades the province of the jury as the factfinder" violates a criminal defendant's "Fifth and Sixth Amendment rights to have the jury determine his guilt or innocence."

The State concedes in its appellate brief that "the instruction as orally pronounced to the jury was erroneous." We will not examine the validity of the rationale underlying that concession. Because Matthews only needed to show that the instruction was either legally or factually inappropriate, we move to the third step in our analysis to determine whether the error requires reversal.

Matthews' objection to Instruction No. 11 was that the instruction "directs the jury to convict of aggravated kidnapping if they convict on rape." But the jury did not convict

8

Matthews of rape. So any verdict-directing aspect of the instruction did not come into play.

Matthews argues that because there was a hung jury, he was not acquitted of rape. Thus, at least one juror believed he raped A.K. and that juror, based on the oral reading of Instruction No. 11, was not required to consider whether the State proved bodily harm to satisfy the element of aggravated kidnapping. That juror could simply accept the court's oral instruction that the rape in and of itself satisfied the bodily harm requirement of aggravated kidnapping.

On the other hand, the hung jury on Matthews' rape charge also indicates that at least one juror believed the State failed to prove that Matthews raped A.K. The jury was instructed that "[i]n order for the defendant to be found guilty of aggravated kidnapping, you must unanimously agree upon the same underlying act." If some jurors believed Matthews raped A.K., while others believed he did not do so, they necessarily could not have unanimously agreed that rape was what caused A.K.'s bodily harm. Instead, the jury must have agreed that Matthews inflicted bodily harm on A.K. through some other act.

The testimony from A.K., from Dr. Kier Swisher, who examined her after this incident, and from Nurse Groot provided alternative instances of bodily harm caused by Matthews which could support this element of the crime of aggravated kidnapping. Applying the standard in *Ward*, 292 Kan. at 565, we conclude that the oral instruction to the jury does not require reversal because we are persuaded "beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict."

This claim of error fails.

*The Admission of Evidence of Prior Drug Use*

Matthews argues the district court erred when it admitted evidence that the reason he was being sent to a halfway house was his use of methamphetamine. Matthews does not contend that the fact that he was being sent to a halfway house was irrelevant. Rather, he claims it was the reason—his use of methamphetamine—that was irrelevant and inadmissible.

*Standard of Review*

As with all claims of error in the admission of evidence, the opponent to admission must lodge a timely and specific objection in order to preserve the issue for appellate review. K.S.A. 60-404.

The specific steps for admitting evidence under K.S.A. 2018 Supp. 60-455 are set forth in *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012):

"● First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.

"● Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.

"● Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the

10

defendant. The appellate court also reviews this determination only for abuse of discretion."

Finally, the district court was required to provide the jury with a limiting instruction which identified the specific purpose for admitting this evidence and instructed the jury that it can only consider the evidence for this stated purpose. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018); *State v. Inkelaar*, 293 Kan. 414, 424, 264 P.3d 81 (2011), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

*Analysis*

*—Preservation*

The State concedes that there is no issue about preservation of this issue for review. Matthews raised a timely and specific objection at trial.

*—Materiality*

The essence of the district court's ruling was that the argument between Matthews and A.K. and the altercation that followed were motivated—at least in part—by Matthews' state of mind after he learned that he was being sent to a halfway house because of his positive drug test. In his appellate brief, Matthews concedes that "motive and marital discord were materially at issue in this case." The evidence of Matthews' positive drug test was material.

*—Relevancy*

Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Matthews argues that why he was being sent to a halfway house was not relevant.

The court admitted the evidence that Matthews was being sent to the halfway house because the urine sample he provided his probation officer tested positive for methamphetamine. The court found this evidence related to Matthews' state of mind and the "deteriorating marital relationship and the marital discord" which played a role in the events leading to the charges against Matthews.

Matthews' federal probation officer, Annelies Snook, came to Matthews' home to check on him because he had missed an appointment for a scheduled urinalysis. Matthews realized it was Snook at the door and told A.K. to tell Snook he was not at home. When A.K. answered the door, Snook told A.K. that she knew Matthews was at home, so A.K. told Matthews that he needed to come to the door and talk to Snook. This encounter led to Matthews having to submit to a urinalysis the following day, which tested positive for methamphetamine. The State's theory was that Matthews was angry with A.K. for jeopardizing his probation by admitting to Snook that he was at home, resulting in Matthews having to provide a urine sample that tested positive for methamphetamine. This evidence had a tendency to prove the motive and marital discord that helped explain the altercation that led to the charges against Matthews. This evidence was relevant under K.S.A. 60-401(b).

Matthews also argues that the fact that he was being sent to a halfway house and his concerns for his property and A.K.'s fidelity while he was gone were enough to show the motive and marital discord that were the bases for the district court's ruling. In other words, the State already had enough evidence of motive and marital discord without

12

evidence of the positive drug test, and there was no need to "pile on" with this drug evidence. But when Evidence A tends to show motive and marital discord and Evidence B also tends to show motive and marital discord, we do not read K.S.A. 2018 Supp. 60-455 to permit the admission of only Evidence A or Evidence B, but not both.

As noted earlier, we apply the abuse of discretion standard in reviewing the district court's admission of evidence at trial. A district court abuses its discretion if its ruling is (1) arbitrary, fanciful, or unreasonable; or (2) is based on an error of fact or law. *Ingham*, 308 Kan. at 1469. Applying these standards, we find no abuse of discretion in the district court's admission of this evidence.

### —*Limiting Instruction*

The district court provided the following limiting instruction to the jury: "Evidence has been admitted tending to prove that the defendant committed bad acts other than the crimes charged. Such evidence may only be considered as evidence of defendant's motive and of the marital discord between the parties." Instruction No. 26. Matthews does not challenge the substance, adequacy, or timing of this instruction. We presume that the jury followed this instruction in deciding the case. *State v. Thurber*, 308 Kan. 140, 194-95, 420 P.3d 389 (2018).

### —*Probative Value vs. Prejudicial Effect*

Under the third step in *Torres*, the district court was required to determine whether the probative value of the evidence outweighed its potential for undue prejudice against the defendant. We review the district court's determination for any abuse of its discretion. Matthews argues the district court erred by finding that the probative value of the evidence was not outweighed by its potential for producing undue prejudice.

13

At the pretrial hearing on the admissibility of this evidence, Matthews did not oppose the admission of evidence that he was on probation at the time of this incident and that he was being sent to a halfway house. His opposition was to evidence that he was being sent to the halfway house because of his positive drug test.

The prosecutor argued, "Well I sort of don't see any way around it because he was on parole and his parole was about to be revoked." Moreover, the jury would reasonably infer from evidence that Matthews was on probation that he had an underlying felony conviction. The prosecutor continued, "I think it would be less prejudicial to Mr. Matthews that the jury hears that the conviction is for a drug offense rather than let them assume that it's for something else."

*State v. Davis*, 213 Kan. 54, 58, 515 P.2d 802 (1973), describes the types of prejudice that can arise from the admission of evidence of prior crimes or bad acts.

The first type of prejudice is based on the possible inference that since the defendant committed this type of crime before, he probably did it again this time. This type of prejudice does not come into play in this case. The K.S.A. 60-455 evidence related to drug use. Matthews is not charged with any drug crime in this case, nor is it claimed he was on drugs at the time of these crimes.

The second type of prejudice arises from the possibility of the jury deciding that the defendant deserves punishment because he is a general wrongdoer, regardless of the lack of evidence in the current case.

There was plenty of wrongdoing to spread around in this case, and it did not all fall on Matthews' shoulders. Snook, the federal probation officer, testified that in a series of text messages Matthews told her that A.K. was "a drug addict who admitted to you that she does drugs . . . . [S]he [is] doing drugs, if you don't believe what she did call the

14

health department." In other text messages read to the jury, Matthews referred to A.K. being "high" at the time of the altercation.

A.K.—the State's key witness— testified that she had previously been convicted of theft. In 1995 she was convicted of issuing a worthless check. In 2001 she was convicted of obstruction of justice for lying to the police about harboring a fugitive. In 2003 she was convicted of possession of stolen property—a stolen license plate that was on her car. In 2007 she was convicted of forgery and theft by deception.

We do not find any indication that this second type of prejudice worked to Matthews' overall disadvantage. The basic facts of the altercation came down to a swearing match between Matthews and A.K, and there was as much, if not more, evidence of drug use by A.K. compared to that of Matthews. The admission of the evidence of Matthews' drug use did not result in undue prejudice to him.

The third type of prejudice arises from the possibility that the jury refuses to believe the defendant's testimony because he is a convicted criminal. Here, there was evidence of A.K.'s many past crimes of dishonesty. Matthews denied raping A.K. He contended that they engaged in consensual sex. The State was unable to convict Matthews of rape. It is obvious that not all jurors believed A.K., who claimed Matthews had raped her. This type of prejudice inured more to A.K.'s detriment than to that of Matthews.

In conclusion, we find no abuse of discretion in admitting into evidence the reference to Matthews testing positive for methamphetamine on one occasion. Matthews concedes that this evidence was material. The district court did not abuse its discretion in finding that this evidence was relevant. Moreover, the evidence was not unduly prejudicial to Matthews, and the district court gave an appropriate limiting instruction. This claim of error fails.

15

Affirmed.

\* \* \*

LEBEN, J., concurring: I agree with the majority that any error in the jury instructions was harmless and that the district court did not err in admitting evidence about why the defendant, Marshall Matthews III, was being sent to a halfway house. But my analysis of the jury-instruction error is different, so I will address that issue separately.

Based on the record, we must assume that the district court judge inadvertently misstated the instruction at issue. I think that it's at least equally likely that the transcript is what's in error. After all, the key sentence as contained in the transcript—"Rape is an act of violence and as a matter of law constitute bodily harm."—is obviously in error. It either needed the missing word "can" (as in "can constitute") or needed the plural form of the verb (as in "as a matter of law *constitutes* bodily harm"). Since no one objected or stopped the judge to suggest a misstatement, it's quite possible that the error is in the transcript.

But if the judge misspoke, it's hard to imagine that jurors would have relied on that oral statement, which is grammatically incorrect and thus hard to grasp quickly, over the written instructions that are uncontested on appeal. Those written instructions were given to the jury only a short time after they got the oral ones, and the written instructions—not a transcript of the oral ones—are what the jurors had in front of them in the jury room.

I cannot assume that no juror could have found that a rape occurred; at least one juror apparently did. But even if the judge misstated that instruction, I cannot conclude that it made any difference here under the appropriate legal standard.

16

The defendant did not object at trial when the misstatement was apparently made. When there's no objection to a jury instruction, we reverse the jury's verdict only if we are firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). I am not firmly convinced that this oral misstatement had any effect on the jury.

As the defendant notes in his brief, the Kansas Supreme Court did find in *State v. Castoreno*, 255 Kan. 401, 407-08, 411-12, 874 P.2d 1173 (1994), that an error in the reading of the instructions in that case wasn't cured by the later written instruction set. But the district court in *Castoreno* made two instruction errors, and the Kanas Supreme Court noted "the cumulative effect of the [erroneous] instructions" and concluded that it could not "say with firm conviction that absent the two erroneous instructions, the jury would have returned the same verdict." 255 Kan. at 411.

That's not our case. Here, we have a slip of the tongue that resulted, based on the transcript, in a sentence that had grammatical problems and would have been hard to digest in an instant. The jury then received correct written instructions only a short time later. So I conclude that the error was highly unlikely to have had any effect on the jury. And that does not meet the required standard—being firmly convinced that the jury would have reached a different verdict had the instruction error not occurred—for reversing a jury's verdict. See *State v. Montgomery*, No. 118,205, 2019 WL 1303086, at *6-7 (Kan. App. 2019) (unpublished opinion) (finding no clear error when oral misstatement in jury instruction was corrected in the written instruction), *rev. denied* December 6, 2019.